UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

BETSY J. JACQUET, PATRICIA E. KUZARA,
and others similarly situated,

       Plaintiffs,

v.                                    CIVIL ACTION NO. 2:05-0548

DOMINION TRANSMISSION, INC.,
DOMINION RESOURCES, INC.,
DOMINION VIRGINIA POWER, and
DOMINION NORTH CAROLINA POWER,

       Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending is the motion of defendants Dominion Virginia Power and Dominion North Carolina Power to dismiss for failure to serve, filed July 15, 2005, to which the plaintiffs have failed to respond.  In view of the substantial passage of time without service, the motion is granted.  <u>See</u> <u>Mendez v. Elliot</u>, 45 F.3d 75, 78 (4th Cir. 1995) (observing that Federal Rule of Civil Procedure 4(m) requires "that if the complaint is not served within 120 days after it is filed, the complaint must be dismissed absent a showing of good cause").

Pending also are plaintiffs' motion to remand, filed August 1, 2005, and the motion of defendants Dominion

Transmission, Inc., and Dominion Resources, Inc., to dismiss for failure to state a claim upon which relief can be granted, filed July 15, 2005.[1]

I.

A.   Factual Background

        This action arises from a mistaken report submitted by defendant Dominion Transmission, Inc. ("Dominion Transmission"), to the Energy Information Administration ("EIA"), the data collecting division of the U.S. Department of Energy.  (Compl. ¶ 13; Not. of Rem. ¶ 10).  Among other things, EIA is charged with providing weekly estimates of working gas volumes held in underground storage facilities at the national and regional levels.  (Methodology for EIA Weekly Underground Natural Gas Storage Estimates, attached as Ex. B to Mot. to Rem.)  To secure accurate estimates, EIA designed Form EIA-912, entitled "Weekly Underground Natural Gas Storage Report."  (Id. at 1).  Every week, various operators of underground natural gas storage fields

---

        [1] Also pending are the motions for leave to exceed the page limitation in memoranda respecting the motion to dismiss, one filed by defendants Dominion Resources, Inc., and Dominion Transmission, Inc., and the other by the plaintiffs.  It is ORDERED that both of the motions to exceed the page limitation be, and they hereby are, granted.

must report their volume of working gas in storage by completing
Form EIA-912 and filing it with EIA.  (Id. at 2-3).  EIA then
compiles the data submitted by the operators and publishes a
weekly natural gas storage report estimating the total working
gas in storage.  (Id. at 3).

     Dominion Transmission, a major provider of natural gas
transportation and storage services in six states, including West
Virginia and Virginia, was among those operators selected to
report natural gas supply levels by completing Form EIA-912.[2]
(Compl. ¶ 13).  On November 22, 2004, an employee of Dominion
Transmission correctly completed Form EIA-912 for the week ending
November 19, 2004.  When the employee attempted to file the
November 19 Form EIA-912, however, he inadvertently submitted a
different data file, namely, the Form EIA-912 for the week ending
September 24, 2004.  (Id. ¶ 1, 14; OMOI Summary of Invest.,
attached as Ex. F to Mot. to Rem.).  This reporting error made it
appear as though Dominion Transmission had withdrawn a
substantially larger portion of its natural gas storage than had

_____

     [2] Although plaintiffs allege in their complaint that each of
the named defendants was required to report weekly gas supply
levels to EIA, there is no evidence demonstrating that Dominion
Resources, Inc., Dominion Virginia Power, or Dominion North
Carolina Power were under such an obligation.  In any event, only
Dominion Transmission's reporting efforts are pertinent in this
matter.

actually been the case.  (Preliminary Summary of Events, attached as Ex. E to Mot. to Rem.).

On November 24, 2004, EIA released its weekly gas storage report for the week ending November 19, 2004, incorporating the erroneous reporting data submitted by Dominion Transmission.  (Id. at 1).  Market observers had anticipated a relatively moderate net withdrawal from storage of between 13 to 25 billion cubic feet (Bcf) of natural gas for the week ending November 19.  (Id.).  Due to Dominion Transmission's reporting error, however, EIA's November 24 weekly report showed a net withdrawal of 49 Bcf from storage.  (Id.).  As a result, the price of natural gas futures contracts on the New York Mercantile Exchange increased immediately.  (Id.).

After issuing its weekly report on November 24, EIA contacted Dominion Transmission to confirm the accuracy of the data provided.  (Id.).  Dominion Transmission realized its mistake and promptly submitted the correct file.  (Id.).  On December 2, 2004, EIA issued a revised storage report based on the corrected data submitted by Dominion Transmission.  (Id.). Following the release of the December 2 report, the price of natural gas futures contracts normalized.  (Id.).

4

The Federal Energy Regulatory Commission ("FERC") thereafter investigated Dominion Transmission's reporting error, characterizing the event as a mere "clerical error."  (Id.). Nevertheless, FERC observed that the event likely had a significant impact on natural gas prices.  Although the price of natural gas fell within eight days of Dominion Transmission's reporting error, the higher prices between November 24 (when EIA issued its weekly report incorporating the erroneous data) and December 2 (when EIA published a corrected report) resulted in higher index-priced contracts for December deliveries of natural gas.  (Id.).  Stated differently, local natural gas distribution companies that purchased natural gas from owners and operators of underground storage facilities were forced to pay higher prices for the natural gas delivered in December 2004 than they would have paid had Dominion Transmission not filed the incorrect report.  Inasmuch as local distribution companies typically pass on the commodity price of natural gas directly to their consumers in the form of higher natural gas rates, FERC estimated that the mistake would cost U.S. consumers between $200 million and $1 billion.  (Compl. ¶ 15; AGA Primer on Natural Gas Prices (1997), attached as Ex. B to Pls.' Mot. for Oral Arg.).

5

B.   Procedural History

On February 16, 2005, plaintiffs Betsy J. Jacquet and Patricia E. Kuzara, residents of West Virginia and Virginia, respectively, initiated this class action in the Circuit Court of Kanawha County "on behalf of all defendants' customers."  (Compl. ¶ 8).  Named as defendants were (1) Dominion Transmission, Inc.; (2) Dominion Resources, Inc. ("Dominion Resources"), Dominion Transmission's parent company; (3) Dominion Virginia Power ("Dominion Virginia"), a subsidiary of Dominion Resources that transmits and distributes electricity to residential and commercial consumers in Virginia and West Virginia; and (4) Dominion North Carolina Power ("Dominion North Carolina"), a subsidiary of Dominion Resources that transmits and distributes electricity to residential and commercial consumers in North Carolina.[3]  (Compl. ¶¶ 4-7).  Plaintiffs' complaint, which is not separated into various counts, alleges that "an agent of the defendants negligently, carelessly and recklessly sent to the

_____

[3] Inasmuch as plaintiffs' complaint arises from Dominion Transmission's reporting error and the alleged higher natural gas prices that followed, it is unclear why plaintiffs named as party defendants Dominion Virginia and Dominion North Carolina, both of which distribute electricity.  Other than asserting that Dominion Virginia and Dominion North Carolina are principally located in Virginia and North Carolina, respectively, plaintiffs make no other allegations regarding these entities.

United States Energy Department the storage levels for the wrong week," making "it appear that supplies were dwindling faster than expected" and "sending future prices soaring."  (Id. ¶ 14). Plaintiffs further allege that "defendants negligently, carelessly, and recklessly failed to correct the report with the United States Energy Department or to otherwise publicize their error in an appropriate manner."  (Id. ¶ 15).  The proximate result of defendants' conduct in this regard, according to the complaint, was that "[w]holesale gas prices . . . soared[,] increasing fuel costs by $200 million to $1 billion" and that "consumer fuel[] costs were inflated to consumers such as plaintiffs."  (Id. ¶ 17).  Plaintiffs seek compensatory and punitive damages, prejudgment and post-judgment interest, costs, and attorneys' fees.

On June 10, 2005, plaintiffs forwarded their summons and complaint to the West Virginia Secretary of State for service upon defendants Dominion Transmission and Dominion Resources. (Sec. of St. Corr., attached as Ex. A to Not. of Rem.).  These entities were subsequently served on June 14, 2005. (Id.). Defendants Dominion Virginia and Dominion North Carolina were not served.  On July 8, 2005, Dominion Transmission and Dominion Resources removed the action to this court.  (Not. of Rem.).  As

noted, plaintiffs have moved to remand, and Dominion Transmission and Dominion Resources have moved to dismiss for failure to state a claim upon which relief can be granted.  The court will jointly assess these motions, both of which implicate the so-called "filed-rate doctrine."

II.

In support of their motion to dismiss and in opposition to plaintiffs' motion to remand, defendants Dominion Transmission and Dominion Resources (collectively, "defendants") maintain that plaintiffs' claim amounts to an attempt to invalidate a rate filed with a federal regulatory agency.  According to defendants, "the [c]omplaint asks this Court to recalculate and alter the rates [plaintiffs] have paid as consumers of natural gas," even though such rates were approved by and filed with federal and state agencies.  (Defs.' Mem. in Supp. of Mot. to Dismiss at 7).  Defendants assert that, by attacking a filed rate, plaintiffs (1) raise a federal question, thus satisfying the jurisdictional inquiry, and (2) implicate the filed-rate doctrine, thereby necessitating dismissal of their claim.  In assessing these contentions, the court is mindful that "when, as here, state law creates the plaintiff's cause of action, the . . . courts possess jurisdiction to hear only those cases in which a well-pleaded

8

complaint establishes . . . that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Bryan v. BellSouth Commc'ns, Inc., 377 F.3d 424, 429 (4th Cir. 2004) (internal quotation marks omitted).

A.    Suits to Invalidate Rates and the Filed-Rate Doctrine

In Bryan v. BellSouth Communications, Inc., our circuit court of appeals addressed the jurisdictional and procedural implications of a suit to invalidate a rate filed with a federal regulatory agency. Id. at 429-30. The court first recognized that a filed rate or tariff "carries the force of federal law." Id. at 429 (citing MCI Telecomms. Corp. v. Garden State Inv. Corp., 981 F.2d 385, 387 (8th Cir. 1992)). As a result, a suit to enforce such a rate, "and even more clearly a suit to invalidate it as unreasonable," arises under federal law. Id. (quoting Cahnmann v. Sprint Corp., 133 F.3d 484, 488 (7th Cir. 1998)). Accordingly, the court concluded, "[a] claim that seeks to alter the terms of the relationship between carrier and consumer set forth in a filed [rate] . . . presents a federal question" and provides a basis for federal jurisdiction. Id.

By the same token, the Fourth Circuit further observed in Bryan that a suit seeking to invalidate or alter a filed rate

9

implicates the filed-rate doctrine, a judicial creation that bars challenges under state law and federal antitrust laws to rates set by federal agencies.  Id.; see Ark. La. Gas Co. v. Hall, 453 U.S. 571, 578 (1981).  The doctrine arises from the notion that federal agencies are given exclusive jurisdiction to set rates for specified utilities, originally through rate-setting procedures involving the filing of rates with the agencies.  See Keogh v. Chi. & Nw. Ry. Co., 260 U.S. 156, 163 (1922).  As explained by the Fourth Circuit, the purpose of the filed-rate doctrine is twofold: "to prevent discrimination among consumers and to preserve the rate-making authority of [regulatory] agencies."  377 F.3d at 429.  As to the nonjusticiability rationale, the court noted that "authorizing a court to award damages that would effectively impose a rate different from that dictated by [a rate set by a regulatory agency] would usurp the [regulatory agency's] authority to determine what rate is reasonable."  Id. at 430.

The filed-rate doctrine was first extended to natural gas companies in 1981, when the Supreme Court applied the doctrine to the Natural Gas Act, which provides the framework for federal regulation of the natural gas industry.  Ark. La. Gas Co. v. Hall ("Arkla"), 453 U.S. 571, 577 (1981).  As described in

10

more detail below, section 4 of the Natural Gas Act provides that natural gas companies must file their rates for transportation or sale with FERC and allows FERC to hold hearings to determine the lawfulness of the rates. 15 U.S.C. § 717c(e). In approving a rate, FERC conclusively determines that the rate is lawful for transactions subject to its jurisdiction under the National Gas Act. As a result, "[n]o court may substitute its own judgment on reasonableness for the judgment of [FERC]. The authority to decide whether the rates are reasonable is vested . . . solely in [FERC], and the right to a reasonable rate is the right to the rate which [FERC] files or fixes." Arkla, 453 U.S. at 577.

Against this backdrop, the court must assess whether plaintiffs' claim "effectively challenges the reasonableness" of a filed rate, giving rise to federal question jurisdiction and requiring dismissal pursuant to the filed-rate doctrine. Id. Two issues arise in this assessment: first, whether the natural gas rate paid by plaintiffs is a federally-authorized rate; and, second, whether plaintiffs' claim challenges the reasonableness of that rate. If the court answers each of these issues in the affirmative, it must exercise federal question jurisdiction, deny the motion to remand, and dismiss plaintiffs' complaint. Id.

11

B.    The Natural Gas Rate

        Plaintiffs first assert that their claim does not implicate the filed-rate doctrine inasmuch as the Federal Energy Regulatory Commission, the federal agency responsible for regulating natural gas storage and transportation, no longer authorizes natural gas rates through a formal rate-filing mechanism.  To provide context for this contention, the court first reviews the evolution of FERC's rate-setting procedures, relying in large part on the Ninth Circuit's decision in E. & J. Gallo Winery v. Encana Corporation ("Gallo"), 503 F.3d 1027 (9th Cir. 2007), which addressed in detail the filed-rate doctrine as it relates to FERC and natural gas rates.

        Since 1978, the natural gas industry has gone through a deregulation process in which the wellhead price went from FERC rate-setting to a largely market-based system.  (Natural Gas.org, *The History of Regulation* (2004), attached as Ex. C to Pls.' Mot. for Oral Arg.).

> As a result of an overburdened federal regulatory
> system and low price ceilings on wellhead sales imposed
> by FERC, there were acute shortages of natural gas
> during the 1970s.  To ameliorate the shortages,
> Congress began the process of deregulating much of the
> natural gas industry, beginning in 1978 with the
> passage of the Natural Gas Policy Act ("NGPA"), Pub.L.
> No. 95-621, 92 Stat. 3352 (codified as amended at 15

12

> U.S.C. §§ 3301-3432 (1994)).  The NGPA eliminated the
> low price ceilings on wellhead sales, replacing them
> with maximum price ceilings for wellhead sales of
> natural gas that would encourage natural gas
> production.  Id.

Gallo, 503 F.3d at 1036-37.

In 1985, FERC took a further step toward deregulation by entering Order No. 436, commonly referred to as the "Open Access Order."  (Natural Gas.org, *The History of Regulation* (2004), attached as Ex. C to Pls.' Mot. for Oral Arg.).  FERC described the effect of NGPA and Order No. 436 as follows:

> [T]he NGPA and Order No. 436 fundamentally changed two
> key components of the natural gas industry.  First, the
> price of natural gas as a commodity was no longer
> subject to Commission-determined rates.  Second, the
> transportation and sale of natural gas became distinct
> economic and commercial services.

(FERC Order No. 636, 18 C.F.R. Part 284 (1992), at 17-18, attached as Ex. D to Pls.' Mot. for Oral Arg., citing Pub. L. No. 101-60, 103 Stat. 157 (1989); H.R. Rep. No. 29, 101st Cong., 1st Sess., at p. 2 (1989)).

Shortly thereafter, Congress passed the Wellhead Decontrol Act of 1989 ("WDA"), which carried forth the deregulation of wellhead prices by allowing the market to completely determine the price of natural gas at the wellhead.  (Natural Gas.org, *The History of Regulation* (2004), attached as

Ex. C to Pls.' Mot. for Oral Arg.).  The WDA eliminated FERC's authority to set prices at the wellhead by removing "first sales" (i.e., sales of natural gas that are not preceded by a sale to an interstate pipeline, intrastate pipeline, local distribution company, or retail customer) from FERC's rate-setting jurisdiction.  Gallo, 503 F.3d at 1037.  In response to the WDA, pipeline companies "bundled" their transportation service with their own natural gas sales, requiring customers to purchase both.  Id.

On April 8, 1992, FERC entered Order No. 636 ("Final Restructuring Rule"), forcing pipelines to separate, or "unbundle," their transportation and sales services.  Id.; (AGA Primer on Natural Gas Prices (1997), attached as Ex. B to Pls.' Mot. for Oral Arg.).  Order No. 636 requires pipeline operators to provide equal access to their systems for all buyers and sellers.  (AGA Primer on Natural Gas Prices (1997), attached as Ex. B to Pls.' Mot. for Oral Arg.).  These actions alleviated the monopolization by the pipelines and put sellers on equal footing in moving natural gas from the wellhead to the local distribution companies.  Gallo, 503 F.3d at 1038; (Natural Gas.org, *The History of Regulation* (2004), attached as Ex. C to Pls.' Mot. for Oral Arg.).  Because of Order No. 636, "consumers could purchase

14

natural gas at the wellhead in an unregulated first sale and then
arrange to transport the natural gas via the interstate
pipelines, paying separately for the product (natural gas) and
the service (transportation)."  Gallo, 503 F.3d at 1038.

By Order No. 636, FERC also explained that "Congress
did not decontrol or deregulate gas pipelines or gas pipeline
sales that are not 'first sales'"; rather FERC was "instituting
light-handed regulation" regarding the remaining, undisturbed
authority left to it by Congress.  (FERC Order No. 636, 18 C.F.R.
Part 284 (1992), at 138, 140, attached as Ex. D to Pls.' Mot. for
Oral Arg.).

> Following Order 636, FERC continued the deregulation of
> rates for the transactions that remained subject to its
> jurisdiction.  After determining that no seller of
> natural gas could obtain market power and that
> market-based rates would be "just and reasonable," see
> id. at 13,296-97; see also Regulations Governing
> Blanket Marketer Sales Certificates, 57 Fed.Reg.
> 57,952, 57,957-58 (Dec. 8, 1992), FERC issued blanket
> certificates for sales for resale of natural gas to all
> persons except interstate pipelines. [footnote omitted]
> This resulted in the suspension of FERC's rate-filing
> requirements for such sales.  57 Fed.Reg. at 57,953.
> These blanket certificates allowed all natural-gas
> companies subject to FERC's jurisdiction to charge
> rates for gas determined by market demand and freed the
> blanket certificate holders from "other regulation
> under the Natural Gas Act jurisdiction of [FERC]."  18
> C.F.R. § 284.402(a).  However, FERC advised the
> regulated natural gas industry that it would continue
> to "monitor the operation of the market through the
> complaint process."  57 Fed.Reg. at 57,958.

Gallo, 503 F.3d at 1038.  FERC has, at times, exercised this

oversight authority.  See, e.g., Enron Power Mktg., Inc., 103

F.E.R.C. ¶ 61,343, ¶ 68 (2003) (revoking Enron's blanket market

certificate); Order Directing Staff Investigation, 2002 WL

32001559 (F.E.R.C. Feb. 13, 2002); Order No. 644, 2003 WL

22758080 (F.E.R.C. 2003).  Indeed, FERC's Office of Market

Oversight and Investigations ("OMOI") exercised that very

authority when it investigated the circumstances surrounding

Dominion Transmission's reporting error.  See supra, pp. 2-3.

          The current, statutorily-prescribed relationship

between FERC and the transporters and sellers of natural gas in

interstate commerce is found in part in 15 U.S.C. § 717c.

Transporters and sellers of natural gas subject to FERC's

jurisdiction (keeping in mind that the WDA, 15 U.S.C. § 3431, has

excluded first sales from FERC jurisdiction) may charge only such

rates as are "just and reasonable."  15 U.S.C. § 717c(a).

>     They may not grant any "undue preference or advantage,"
>     and they must file any change in their rates or
>     services with the Commission [FERC] in advance.  15
>     U.S.C. §§ 717c(b) and 717c(d).  The Commission retains
>     broad regulatory authority to determine the
>     reasonableness of any rates or services.

Stand Energy Corp. v. Columbia Gas Transmission Corp., 373 F.

Supp. 2d 631, 634-635 (S.D. W. Va. 2005).  For example, FERC has

the ability to hold hearings concerning a new schedule of rates.

15 U.S.C. § 717c(e).

As a result of this "light-handed regulation," the retail price for natural gas is in large part determined by the market.  According to EIA, the rate paid by a consumer for natural gas comprises three separate costs: (1) "commodity costs" at the wellhead, or the market-based price of the natural gas itself; (2) "transmission and storage costs," consisting of the expenses required to move and store natural gas between the producing wellhead and a local distribution company; and (3) "distribution costs," referring to those costs incurred to bring the gas from the local distribution company to the consumers' residence or business.  (October 2004 EIA Brochure, attached as Ex. A to Pls.' Mot. for Oral Arg.; see 18 C.F.R. § 284.282). According to plaintiffs, control over transmission and storage costs is left to FERC, and distribution costs are regulated by state regulatory agencies, leaving the commodity costs at the wellhead subject only to market forces.  (October 2004 EIA Brochure, attached as Ex. A to Pls.' Mot. for Oral Arg.; AGA Primer on Natural Gas Prices (1997) at 2, attached as Ex. B to Pls.' Mot. for Oral Arg.).

Plaintiffs seize on EIA's division of the three different components of the cost of natural gas in an attempt to

17

carve out an unregulated niche that reflects defendants' alleged wrongdoing but simultaneously evades the grasp of the filed-rate doctrine.  (Pls.' Memo. in Supp. of Mot. for Oral Arg. at 2, 4-7).  Plaintiffs argue that only the commodity cost component of natural gas was implicated by defendants' wrongdoing.  (Id. at 2).  The federal government, according to the plaintiffs, has "wholly abandoned" its regulatory role in this portion of the cost of natural gas.  (Id. at 6).  They surmise that the alleged wrongdoing had no effect on the regulated transmission and storage or distribution costs.  (Id. at 4).  Citing a publication of the American Gas Association ("AGA"), plaintiffs further contend that the increase in the commodity or actual cost of natural gas on the open market is "passed through" to consumers.  (Id. citing AGA Primer on Natural Gas Prices (1997), attached as Ex. B to Pls.' Mot. for Oral Arg.).  And so, plaintiffs' argument goes, that which was approved by FERC and filed with the state public utility agencies is separate and distinct from the unregulated commodity cost component of natural gas; the difference in the rate increases caused by defendants' wrongdoing allegedly occurred only in the commodity cost component, rendering the filed-rate doctrine inapplicable.

The Ninth Circuit addressed and rejected a similar

18

contention in Gallo, concluding that a retail purchaser could not recover damages based on a theory that rates authorized by FERC were unfair. Gallo, 503 F.3d at 1044. As the Ninth Circuit stated in the context of a motion for summary judgment, "we must partially disagree with the district court's conclusion that Gallo could challenge its retail rates because the court was 'not required to undo or second guess a determination that was specifically made by FERC.'" Id. (internal citation omitted). To the contrary, the court concluded, "for purposes of a challenge to market-based rates for natural gas transactions under FERC's jurisdiction, the principles of the Filed Rate Doctrine are applicable," regardless of whether a retail purchaser is making the claim. Id. at 1043. The Ninth Circuit explained that, "to the extent Congress has given FERC authority to set rates under the NGA and FERC has exercised that authority, such rates are just and reasonable as a matter of law and cannot be collaterally challenged under federal antitrust law or state law." Id. at 1035. The court acknowledged that a market-based rate may not have been the type of rate envisioned when the filed-rate doctrine was created, but nevertheless held that the principles underlying the doctrine apply just as well when market-based rates are involved. Id. at 1039-40. Inasmuch as "FERC determined that the best way to ensure just and reasonable rates

19

in the evolving natural gas market was to allow natural gas sales to proceed at market prices," id. at 1041-42, the Ninth Circuit concluded that "the market-based rate for natural gas transactions under FERC's jurisdiction are FERC-authorized rates" and "cannot be the basis of a federal antitrust or state damage action," id. at 1043.[4]

The court finds the Ninth Circuit's ruling in Gallo persuasive and concludes that the natural gas rates at issue in this matter, although market-based, are nevertheless federally-authorized rates.  Contrary to plaintiffs' contention, FERC has continued to engage in regulatory activity and has not abdicated its rate-making authority in the natural gas context.  Indeed, FERC's efforts to ensure that natural gas rates are just and reasonable can be seen in this very case.  Pursuant to its authority in 15 U.S.C. 717c(a), FERC's OMOI conducted a "full investigation" of the reporting error incident.  (Summary of FERC Invest., attached as Ex. C to M.T.D.).  On February 10, 2005,

_____

[4] The Ninth Circuit recognized in Gallo that its ruling "could leave [the plaintiff-consumer] without a remedy for [the defendant's] misconduct."  503 F.3d at 1044.  The court determined, however, that this equitable consideration did not compel a different result, inasmuch as a "finding that federal law provides a shield for the challenged conduct will almost always leave the state-law violation unredressed."  Id. at 1044-45.

FERC announced that, as part of the investigation, OMOI had
reviewed extensive documentation, taken sworn testimony, and
analyzed relevant data.  (Id.).  FERC's investigation into the
reporting error, together with its decision to implement a
market-based rate regime for natural gas, demonstrates that FERC
has exercised its statutory authority under the NGA to approve
natural gas rates.  Gallo, 503 F.3d at 1041.  Accordingly, a suit
effectively challenging these rates would violate the scope of
statutory authority given to FERC and would therefore be barred
under the filed-rate doctrine.[5]

C.   Plaintiffs' Claim Challenges the FERC-Authorized Rates

          Plaintiffs next contend that the filed-rate doctrine is
inapposite because their complaint "in no way implicates the
terms and conditions by which Dominion provides services to its
customers" and thus "does not subvert the authority of the
relevant rate-setting bodies."  (Pls.' Resp. to Mot. to Dismiss

---

[5] Gallo also undermines plaintiffs' alternative contention
that the filed-rate doctrine is inapplicable inasmuch as their
suit challenges retail natural gas rates, over which FERC lacks
jurisdiction.  The Ninth Circuit observed that the filed-rate
doctrine may serve "as a defense to actions putatively attacking
retail rates, but having the effect of disallowing FERC-approved
wholesale rates," reasoning that the retail rates arose from
"upstream FERC-approved wholesale rates."  Gallo, 503 F.3d at
1044.

at 17).  Defendants, by contrast, contend that plaintiffs run afoul of the filed-rate doctrine merely by seeking compensatory damages predicated on the higher natural gas rates they allegedly paid following Dominion Transmission's reporting error.  Were plaintiffs to succeed, defendants contend, the court would be forced to recalculate the rate of natural gas plaintiffs would have paid but for the mistake, thereby undermining FERC's rate-making authority.

Courts have described the filed-rate doctrine's "fortification against direct attack" as "impenetrable."  See Wah Chang v. Duke Energy Trading & Mktg., LLC, 507 F.3d 1222, 1225 (9th Cir. 2007).  The Ninth Circuit noted in Wah Chang that the doctrine "turns away both federal and state antitrust actions; it turns away Racketeer Influenced and Corrupt Organization Act actions; it turns away state tort actions; and it even turns away state attempts to assert sovereign power to commandeer power contracts."  Id. at 1225-26 (footnotes omitted).  Essentially, any claim that a federally authorized rate is too high is precluded, inasmuch as such a claim would undermine the agency's authority through the medium of direct court actions.

The filed-rate doctrine is not limited to direct attacks against a federally authorized rate.  To the contrary,

22

"even if a claim does not directly attack the filed rate, an award of damages to the customer that would, in effect, result in a judicial determination of the reasonableness of that rate is prohibited under the filed rate doctrine." Hill v. BellSouth Telecomms., Inc., 364 F.3d 1308, 1317 (11th Cir. 2004).  The Eleventh Circuit reasoned in Hill that such indirect attacks on filed rates undermine agency rate-making authority just as much as direct attacks.  Id.

In its Bryan decision, the Fourth Circuit relied on this reasoning in concluding that a customer's suit against a telecommunications carrier was precluded by the filed-rate doctrine.  377 F.3d at 431.  The court first reviewed the plaintiff-customer's claims, noting that the complaint, "read in the light most favorable to the plaintiff[,] nowhere purports to seek any form of damages other than a refund of some portion of the [challenged rate]."  Id.  As a result, the court agreed with the carrier's contention that "any award of damages flowing from [the carrier] to [the customer], no matter how calculated, would violate the filed-rate doctrine . . . by requiring the court to determine a reasonable rate."  Id.  Accordingly, the court found that the customer's indirect attack on the federally-authorized rate both provided the lower court with subject matter

23

jurisdiction and mandated dismissal of the claim.  <u>Id.</u> at 432.

Likewise, the complaint at issue in this matter, read in the light most favorable to plaintiffs, merely seeks a refund of some portion of their natural gas rates, which they contend were unreasonably high due to Dominion Transmission's reporting error.  In what can be described as the "facts" section of plaintiffs' complaint, plaintiffs allege merely that they are "consumer[s] of natural gas," that Dominion Transmission committed the reporting error, and that, as a result, natural gas costs were inflated "by as much as $1 billion."  (Compl. ¶¶ 1-3, 15-16).  In their prayer for damages, plaintiffs seek, <u>inter alia</u>, compensatory damages, apparently compensating plaintiffs for the increased natural gas rate.  Plaintiffs have failed to explain how the court could calculate their damages award without first determining the natural gas rate they would have faced had Dominion Transmission not committed the reporting error.  In essence, then, plaintiffs seek for this court to determine what rates they should have been charged instead of the rates they were charged.  Inasmuch as the filed-rate doctrine precludes the court from making such a determination, the presence of a substantial federal question requires that the motion to remand

be denied and plaintiffs' complaint be dismissed.[6]

Although the filed-rate doctrine precludes tort actions (such as this one) that effectively challenge natural gas rates that have been reported to FERC, consumers may yet protect themselves from the harsh results that might accompany errors such as the one underlying this action.  Most states have elaborate administrative schemes to ensure that retail natural gas rates are just and reasonable for both the utility and the consuming public.  (AGA Primer on Natural Gas Prices, attached as Ex. B to Pls.' Mot. for Oral Arg.)  Both Virginia and West Virginia, for example, have created public service commissions that are required, upon receipt of a consumer's complaint, to conduct a hearing to consider the lawfulness of a proposed rate change.  See Va. Code Ann. § 56-237.2; W. Va. Code § 24-2-4.  The state commission could then reject the proposed rate change as unreasonable or, if the higher retail rate resulted in part from

---

[6] A different conclusion is not warranted simply because plaintiffs seek other forms of damages in addition to their claim for compensatory relief.  Plaintiffs' claim for punitive damages is without merit, inasmuch as punitive damages are not recoverable when compensatory damages cannot be awarded.  See Garnes v. Fleming Landfill, Inc., 186 W. Va. 656, 667, 413 S.E.2d 897, 908 (1991).  Likewise, plaintiffs have not identified a statutory or contractual basis for recovery of attorneys' fees, nor can they otherwise lay claim to recovery of fees and costs as a "prevailing" party.  See syl. pt. 6, Miller v. Lambert, 196 W. Va. 24, 467 S.E.2d 165 (1995)

a FERC-approved wholesale rate, it could lodge a formal complaint with FERC, <u>see</u> 15 U.S.C. § 717l, highlighting the unjust wholesale rate and its impact on consumers.  Alternatively, consumers could present the matter to the regulatory bodies before the next natural gas rate is fixed on an annual basis.  In short, consumers may play an active role in the rate-making process, thereby obviating any need for after-the-fact judicial determinations of a reasonable rate.

D.   Conclusion

In sum, the court concludes that plaintiffs' complaint seeks a refund of the natural gas rates they paid following Dominion Transmission's reporting error.  Because these rates were approved by FERC, plaintiffs' complaint implicates a federally-authorized rate.  Accordingly, the court possesses federal question jurisdiction and, pursuant to the filed-rate doctrine, must dismiss plaintiffs' suit.

III.

For the reasons stated herein, it is, accordingly, ORDERED as followed:

1.   Plaintiffs' motion to remand be, and it hereby is,

26

denied;

2.    Dominion Virginia's and Dominion North Carolina's

      motion to dismiss for failure to serve be, and it

      hereby is, granted;

3.    Dominion Transmission's and Dominion Resources'

      motion to dismiss for failure to state a claim be,

      and it hereby is, granted; and

4.    Plaintiffs' request for attorneys' fees be, and it

      hereby is, denied.

      The Clerk is directed to forward copies of this

memorandum opinion and order to all counsel of record.

DATED: December 30, 2010

John T. Copenhaver, Jr.
United States District Judge

27